**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF ALABAMA**   RECEIVED

2016 MAR 28  P 12: 08

UNITED STATES OF AMERICA *ex rel*. BEN
WIGGINS,

        Plaintiff,

vs.

THE EAST ALABAMA HEALTH CARE
AUTHORITY D/B/A EAST ALABAMA
MEDICAL CENTER, EAST ALABAMA
HOMEMED, LLC, AND SHASHI SHARMA

        Defendants.

Civil Action No. DEBRA P. HACKETT, CLK
     U.S. DISTRICT COURT
     MIDDLE DISTRICT ALA.

3:16-CV-207-WKW-SMB

**FILED UNDER SEAL**
**Pursuant to 31 U.S.C. § 3730(b)(2)**

**DEMAND FOR TRIAL BY JURY**

## COMPLAINT

*Qui tam* relator Ben Wiggins brings this action under the federal False Claims Act, 31

U.S.C. §§ 3729, *et seq*. ("FCA"), on behalf of the United States of America against Defendants,

The East Alabama Health Care Authority d/b/a East Alabama Medical Center, East Alabama

HomeMed, LLC, and Shashi Sharma.  Relator's allegations are based upon his own knowledge

and upon an investigation undertaken by his counsel.  Relator alleges as follows:

### I.    NATURE OF THE CASE

1.    This *qui tam* action is an effort to restore to the United States millions of dollars

Defendants have taken through systematic, long-lived, and continuing fraud, perpetrated through

the Medicare and Medicaid programs.

2.    Defendants are related corporate entities that provide durable medical equipment,

most notably CPAP machines, BiPAP machines, and ventilators, to Medicare beneficiaries and

other patients.

1

3.      Since at least 2013, Defendants have defrauded Medicare by prescribing patients Trilogy 100 ventilators that are not medically necessary and billing Medicare for the monthly rental amount.

## II.    PARTIES

4.      Defendant The East Alabama Health Care Authority d/b/a East Alabama Medical Center ("EAMC") is an Alabama domestic non-profit corporation that operates at 2000 Pepperell Parkway, Opelika, AL 36801.

5.      Defendant East Alabama HomeMed, LLC ("HomeMed"), is an Alabama domestic limited liability company that was created by EAMC and operates at 1908 Pepperell Parkway, #2, Opelika, AL 36801.  EAMC is the sole or controlling member of HomeMed.

6.      Defendant Shashi Sharma is an Alabama licensed medical doctor with a primary specialty in pulmonary medicine and a sub-specialty in sleep medicine.  Dr. Sharma is a member of EAMC's medical staff in its Sleep Disorders Center and also works at Internal Medicine Associates, P.C., which does business at 121 N. 20th St., #6, Opelika, AL 36801.

7.      Relator Ben Wiggins is a resident of the State of Alabama and was employed by HomeMed as a respiratory therapist from August 20, 2012 until May 31, 2015.

8.      The United States is a real party in interest under the FCA and ultimately paid the false claims alleged herein (Medicare claims in full and Medicaid claims in part) and is entitled to the bulk of the recovery sought by this action.  Medicare is a federal health insurance program administered by CMS for the elderly and disabled.  *See* 42 U.S.C. §§ 1395-1395hhh.  Medicaid is a jointly-funded federal and state public-assistance program that pays for certain medical expenses incurred by low-income patients.  *See* 42 U.S.C. §§ 1396-1396v.

### III.  JURISDICTION AND VENUE

9.  Relator brings this action on behalf of the United States under the *qui tam* provisions of the FCA.

10.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 31 U.S.C. §§ 3732(a), which confer jurisdiction over actions brought under 31 U.S.C §§ 3729 and 3730.

11.  This Court has personal jurisdiction over Defendants, and venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because Defendants are found, transact business, and committed violations of 31 U.S.C. § 3729 in this District.

12.  This action is not based upon a prior public disclosure of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; in the news media; or in any other form as the term "publicly disclosed" is defined in 31 U.S.C. § 3730(e)(4)(A).

13.  To the extent there has been a public disclosure unknown to Relator, he is an original source under 31 U.S.C. § 3730(e)(4).  Relator, prior to any such public disclosure, voluntarily disclosed to the Government the information on which his allegations are based and/or has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions and voluntarily provided the information to the Government before filing this action.

### IV.  RELEVANT STATUTES AND REGULATIONS

#### A.  The False Claims Act

14.  The False Claims Act ("FCA") imposes liability on any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval ("false

3

claim"). 31 U.S.C. § 3729(a)(1)(A). The FCA defines "claim" to include any request or demand, whether under contract or otherwise, for money that is made to an agent of the United States or to a contractor if the money is to be spent to advance a government program or interest and the government provides or will reimburse any portion of the money. 31 U.S.C. § 3729(b)(2). The FCA defines "knowingly" to mean actual knowledge, deliberate ignorance of truth or falsity, or reckless disregard of truth or falsity; specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1).

15. The FCA also imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim ("false statement"). 31 U.S.C. § 3729(a)(1)(B). The FCA defines "material" to mean having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property. 31 U.S.C. § 3729(b)(4).

**B. Medicare's Coverage of Durable Medical Equipment**

16. Medicare is composed of parts A, B, C, and D. Part B is relevant to this case.

17. Under Part B, Medicare will pay for the rental or purchase of Durable Medical Equipment, Prosthetics, Orthotics, and Supplies ("DMEPOS") if it is used in the patient's home. *See* 42 C.F.R. § 410.38(a).

18. To be covered, durable medical equipment must meet three requirements:

    a.    It must meet the definition of "Durable Medical Equipment;"

    b.    The equipment must be necessary and reasonable for the treatment of the patient's illness or injury or to improve the functioning of the patient's malformed body member; and

    c.    The equipment must be used in the patient's home.

*See* CMS Medicare Benefit Policy Manual Chp. 15 § 110.

19. "Durable Medical Equipment" is defined as equipment that can withstand repeated use; is primarily and customarily used to serve a medical purpose; is generally not useful to a person in the absence of an illness or injury; and is appropriate for use in the home. *See* CMS Medicare Benefit Policy Manual Chp. 15 § 110.1.

20. The requirement that DMEPOS be necessary and reasonable bars payment when the equipment "cannot reasonably be expected to perform a therapeutic function in an individual case . . . ." Medicare Benefit Policy Manual Chp. 15 § 110.1C.

21. In addition to the foregoing basic requirements, DMEPOS suppliers must obtain and retain certain information prior to dispensing and/or billing for certain "Specified Covered Items" that have been expressly identified by regulation or added by CMS through the notice and comment rulemaking process. *See* 42 C.F.R. § 410.38(g)(2).

22. For these Specified Covered Items, the DMEPOS supplier must obtain a written order that includes the (i) beneficiary's name; (ii) DMEPOS item ordered; (iii) prescribing practitioner's signature; (iv) prescribing practitioner's National Provider Identifier; and (v) date of the order.

23. Effective July 1, 2013, CMS began requiring a face-to-face encounter with the patient who was prescribed the DMEPOS item. The face-to-face encounter must document that a needs assessment, evaluation, and/or treatment of the beneficiary for the medical condition supporting the need for the DMEPOS item ordered occurred within six (6) months prior to the date of the written order. *See* 42 C.F.R. § 410.38(g)(3). If the prescribing practitioner did not conduct the face-to-face examination, the prescribing practitioner must verify that the face-to-face encounter occurred within the six (6) months prior to the date of the written order and obtain documentation that the face-to-face encounter was conducted. *See*

5

https://www.cgsmedicare.com/jc/pubs/news/2014/0214/cope24758.html (last visited March 21, 2016).

24.    The DMEPOS supplier must have a copy of the written order and documentation of the face-to-face encounter before the DMEPOS item can be delivered to the beneficiary or billed to Medicare. *See* 42 C.F.R. § 410.38(g)(1), (3).

25.    Bilevel positive airway pressure ("BiPAP") devices and ventilators are Specified Covered Items that require a written order and face-to-face encounter as a condition of payment by Medicare. *See* https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medicare-FFS-Compliance-Programs/Medical-

Review/Downloads/DME_List_of_Specified_Covered_Items_updated_March_26_2015.pdf (last visited March 21, 2016).

26.    Medicare pays for DMEPOS items based on a published fee schedule. *See* https://www.cgsmedicare.com/jc/pubs/news/2014/0214/cope24758.html     (Durable     Medical Equipment Regional Carrier for Alabama setting forth the face-to-face examination requirements) (last visited March 21, 2016).

27.    Medicare classifies DMEPOS items into the following payment categories:

      a) inexpensive or other routinely purchased durable medical equipment;

      b) items requiring frequent and substantial servicing;

      c) certain customized items;

      d) other prosthetic and orthotic devices;

      e) capped rental items; and

      f) oxygen and oxygen equipment.

*See* https://www.cgsmedicare.com/jc/pubs/news/2014/0214/cope24758.html (last visited March 21, 2016).

28.     Relevant to this case, Medicare has classified ventilators, such as the Trilogy 100, as "items requiring frequent and substantial servicing. Medicare Claims Processing Manual Chp. 20 § 130.3. Suppliers who furnish these items are paid the "fee schedule amounts on a rental basis until medical necessity ends." Medicare Claims Processing Manual Chp. 20 § 30.2. The Healthcare Common Procedure Coding System ("HCPCS") billing codes for ventilators are E0450 and E0460-E0464.

29.     CPAP and BiPAP devices are classified in the capped rental items payment category.   Capped rental items are paid based on Medicare's fee schedule amount for a maximum of fifteen (15) months, with the beneficiary being given the option to purchase the equipment in the tenth (10) month. Medicare Claims Processing Manual Chp. 20 § 30.5. The HCPCS code for CPAP is E0601. The HCPCS codes for BiPAP devices are E0470-E0472.

**C.     Medicare's Coverage of CPAP, BiPAP and Ventilators**

30.     Medicare covers ventilators, both positive and negative pressure types, for patients who suffer from neuromuscular diseases, thoracic restrictive diseases, and chronic respiratory failure consequent to chronic obstructive pulmonary disease. *See* Medicare National Coverage Determinations Manual Chp. 1, part 4 § 280.1.

31.     Medicare covers CPAP for patients diagnosed with obstructive sleep apnea when the beneficiary has a face-to-face clinical evaluation by the treating physician to assess for obstructive sleep apnea, a sleep study is conducted, and the beneficiary or beneficiary's caregiver is instructed on the proper use and care of the equipment. *See* CGS Administrators, LLC, Local Coverage Determination: *Positive Airway Pressure (PAP) Devices for the Treatment of Obstructive Sleep Apnea* (L33718) (eff. 10/1/2015).

7

32.     Medicare also covers Respiratory Assist Devices - bi-level pressure capacity devices with or without backup (i.e., BiPAP) - when a patient suffers from "restrictive thoracic diseases (i.e., neuromuscular diseases or severe thoracic cage abnormalities), severe chronic obstructive pulmonary disease ("COPD"), central sleep apnea or complex sleep apnea, or hypoventilation syndrome."     CGS Administrators, LLC, Local Coverage Determination: *Respiratory Assist Devices* (L5023) (eff. 10/1/1999-9/30/2015).

33.     Although some of the qualifying clinical conditions for BiPAP machines and ventilators are the same, they "are not overlapping." CGS Administrators, LLC, Local Coverage Determination: *Respiratory Assist Devices* (L5023).  BiPAP machines may be covered for "clinical conditions that require intermittent and relatively short durations of respiratory support."  *Id.*  These clinical conditions "are not life-threatening conditions where interruption of respiratory support would quickly lead to serious harm or death."  *Id.*

34.     Ventilators, on the other hand, may be covered when the patient's condition is life threatening, such that interruption of respiratory support would quickly lead to serious harm or death. Ventilators are not eligible for "reimbursement for any of the conditions described in the RAD LCD even though the ventilator equipment may have the capability of operating in a bi-level PAP [] mode." *Id.*

35.     If the patient meets the qualifying criteria for a CPAP or BiPAP machine, Medicare will cover the device for three (3) months.  To qualify for additional coverage, the beneficiary must be reevaluated to establish that the BiPAP device continues to be medically necessary.   Thus, the DME supplier must obtain a signed and dated statement from the beneficiary's treating physician declaring that the beneficiary is compliantly using the device at least four (4) hours, on average, per 24 hour period, and is benefiting from using the CPAP or

8

BiPAP machine.  *See* CGS Administrators, LLC, Local Coverage Determination: *Positive Airway Pressure (PAP) Devices for the Treatment of Obstructive Sleep Apnea* (L33718); and CGS Administrators, LLC, Local Coverage Determination: *Respiratory Assist Devices* (L5023).

### D.     Compliance With Medicare Regulations is a Pre-Requisite for Payment Under Both Programs

36.     To be eligible to collect Medicare payments, a provider must submit a Form CMS-855S application and any supporting documentation to Medicare.  If the provider's application is accepted by Medicare, the supplier receives a billing number and is then eligible to receive Medicare payments.  42 C.F.R. § 424.57(b).  To be eligible to receive payments from Alabama Medicaid for DMEPOS, the foregoing Medicare eligibility requirements must be met and the provider must submit an application to the Alabama Board of Home Medical Equipment to become licensed as a DMEPOS supplier.  Ala. Admin. Code. Chp. 13 § 560-X-13-.02.[1]

37.     DMEPOS suppliers enroll in Medicare by submitting a Form CMS-855S, Medicare Enrollment Application.[2]  Among other things, Form CMS-855S sets forth an "abbreviated summary of the standards every Medicare DMEPOS supplier must meet in order to obtain and retain their billing privileges."  When submitting Form CMS-855S, the DMEPOS supplier must certify, in relevant part, that: 1) it will "abide by . . . all applicable Medicare laws, regulations and program instructions that apply to this supplier."; 2) it understands that "*payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with*

[1] *See also* Alabama Medicaid Supplier Manual Chp. 14 http://www.medicaid.alabama.gov/documents/6.0_Providers/6.7_Manuals/6.7.2_Provider_Manuals_2016/6.7.2.1_Ja nuary_2016/Jan16_14.pdf (last visited March 21, 2016).

[2] Form CMS-855S is accessible at https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/cms855s.pdf (last visited March 21, 2016).

*all applicable conditions of participation in Medicare.*"; and 3) that it will not "knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and I will not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." CMS-855S, § 15A, ¶¶ 4, 7 (emphasis added).

38.     Claims for payment submitted to the Government in knowing violation of any material rules or requirements constitute false claims for purposes of the FCA. By the same token, certifications falsely attesting to compliance with such material requirements constitute false statements for purposes of the FCA. Additionally, any person knowingly assisting or participating in the violation of material requirements is liable under the conspiracy provisions of the FCA.

## V.     DEFENDANTS' UNLAWFUL CONDUCT

39.     Defendants defraud the government by identifying and then having Trilogy 100 ventilators prescribed to patients when it is not medically necessary.

40.     EAMC owns and created HomeMed in 2009. HomeMed is run by Chris Pappas and Rodney Meadows, who hold themselves out as Directors.

41.     Much of HomeMed's business for CPAP, BiPAP, and Trilogy 100 ventilators comes from referrals by Drs. Shashi Sharma, Steven E. Dekich, and Robert H. Walkup. These pulmonologists are part of EAMC's medical staff and members of Internal Medicine Associates, P.C. Dr. Sharma sends virtually all of his patients to HomeMed when he prescribes durable medical equipment. As an example, one patient specifically requested to use Lincare to supply the Trilogy 100 prescribed by Dr. Sharma, but Dr. Sharma told the patient that HomeMed had to be used because he liked using HomeMed.

42.     At all times relevant to this Complaint, HomeMed employed Relator and Rusty Alliston as respiratory therapists.

10

43. At all times relevant to this Complaint, HomeMed exclusively used Philips Respironics CPAP, BiPAP, and Trilogy 100 ventilators.

44. The Trilogy 100 is an FDA Class II continuous ventilator medical device. *See* 21 C.F.R. § 868.5895. It "provides continuous or intermittent ventilator support for the care of individuals who require mechanical ventilation." *See* Trilogy 100 Ventilator, FDA 510(k) Premarket Notification (Mar. 13, 2009) http://www.accessdata.fda.gov/cdrh_docs/pdf8/K083526.pdf (last visited March 21, 2016). The Trilogy 100 can provide pressure support, pressure control, or volume controlled ventilation. *Id.*

45. The Trilogy 100 can be set up to provide CPAP, BiPAP, or ventilation therapy. It can only be billed to Medicare, however, as a ventilator. The DMERCS have expressly informed DMEPOS suppliers that ventilators are not "eligible for reimbursement for any of the conditions described in the [Respiratory Assist Devices Local Coverage Determination] even though the ventilator equipment" is capable of operating in BiPAP mode. *See Correct Coding and Coverage of Ventilators*, http://www.cgsmedicare.com/jc/pubs/news/2014/0414/cope25225.html (Apr. 3, 2014) (last visited March 21, 2016). Thus, the Trilogy 100 can only be billed when it is prescribed and used as a ventilator, not as a BiPAP or CPAP.

46. When Relator first started working with HomeMed in 2012, he set up and instructed patients on how to use CPAP or BiPAP machines.

47. In 2013, Dr. Sharma first prescribed a Trilogy 100 to a patient and sent the order to HomeMed. In his prescription, however, Dr. Sharma wrote the inspiratory and expiratory airway pressures (IPAP and EPAP, respectively) he wanted the Trilogy 100 to be set. IPAP and EPAP are used for BiPAP machines, not ventilators which use a tidal volume. Relator set up the Trilogy 100 for use as a BiPAP as prescribed by Dr. Sharma and instructed the patient on how to

11

use the Trilogy 100. HomeMed billed the Trilogy 100 as a ventilator, even though it was being used as a BiPAP.

48.     Thereafter, Dr. Sharma prescribed several other patients the Trilogy 100, each time identifying the IPAP and EPAPs for each patient. Each time, HomeMed billed the Trilogy 100 as a ventilator even though it was being used as a BiPAP.

49.     Subsequently, Medicare began denying HomeMed's claims for reimbursement of the Trilogy 100 because it was being used as a BiPAP. In response, Rodney Meadows told Relator that patients needed to be switched to "vent" mode. HomeMed then had a Philips Respironics representative provide an in-service training session for Relator and Rusty Alliston to show them how to setup the Trilogy 100 into vent mode. Thereafter, all of Dr. Sharma's initial patients who were prescribed a Trilogy 100 with IPAP and EPAPs were switched to a tidal volume in vent mode so HomeMed could continue billing the Trilogy 100 as a ventilator.

50.     Subsequently, when HomeMed received Trilogy 100 prescriptions from Dr. Sharma that contained IPAP and EPAPs, HomeMed would disregard the IPAP and EPAPs and set the patient up with a tidal volume in vent mode so it could bill Medicare for a ventilator. At some time after June 2013, Dr. Sharma stopped providing IPAP and EPAPs when he prescribed Trilogy 100s, instead noting that the respiratory therapist would assess the patient.

51.     Because the Medicare reimbursement for the Trilogy 100 is approximately 3 to 7 times higher than for BiPAP,[3] HomeMed devised a scheme to find patients it could get prescribed a Trilogy 100. HomeMed's initial goal, as expressed by Chris Pappas in approximately June 2013, was to get 6 Trilogy 100s prescribed to cover Relator's salary.

---

[3] Trilogy 100 ventilator reimbursement is approximately 3 times greater for BiPAP with backup and 7 times greater than BiPAP without backup because Medicare reimbursement is greater for BiPAP with backup than BiPAP without backup.

52.     To increase the number of patients prescribed the Trilogy 100, Rodney Meadows and Chris Pappas told Relator and Rusty Alliston to look through patient files and find patients who could be prescribed the Trilogy 100.  Because HomeMed is connected and has access to EAMC's medical records, Relator would often view the medical records of patients who were admitted to the Intensive Care Unit ("ICU") or transferred to a step-down unit. If the medical records indicated the patient had an arterial blood gas greater than 55, or were acidotic at or during admission and the patient's medical history indicated the patient had a history or diagnosis of respiratory failure, Relator would notify Tonya Williams.  Tonya Williams would then call Dr. Sharma and ask if the patient could be prescribed the Trilogy 100.  When Dr. Sharma agreed, HomeMed would send Dr. Sharma the appropriate paperwork to have the patient prescribed a Trilogy 100.  Based on Relator's experience, Dr. Sharma always agreed to prescribe a Trilogy 100 when requested by Tonya Williams.

53.     After identifying approximately 4-5 patients to be prescribed the Trilogy 100, someone at EAMC discovered that Relator was accessing patient medical records and called HomeMed to indicate that doing so was inappropriate.  Rodney Meadows then told Relator to stop generally searching through EAMC's medical records and confine all future searches of EAMC's medical records to current HomeMed patients or Dr. Sharma's patients.   Since effectively confining its search to patients referred from Dr. Sharma, HomeMed has involved the entire office in perpetuating its fraud.

54.     Messrs. Pappas and Meadows instructed HomeMed's billers to review referred patients' medical charts for a diagnosis of respiratory failure and/or an arterial blood gas $pCO_2$ measurement greater than 55.[4]  As long as a patient's medical record reflects a diagnosis of

_____

[4] $pCO_2$ or $PaCo_2$ stands for partial pressure of carbon dioxide and measures how much carbon dioxide is dissolved in the blood and how well it is moved out of the body.

respiratory failure, whether acute or chronic, or a pCO2 measurement greater than 55 at any time from admission to discharge, the patient is flagged as a candidate for a Trilogy 100.

55.    Once flagged, Relator or Rusty Alliston review the patient's chart to determine whether the patient qualifies for a Trilogy 100, as set forth in guidelines created by HomeMed. Virtually every time Relator reviewed a patient's chart, he told Tonya Williams, Chris Pappas, or Rodney Meadows that the patient did not qualify for a Trilogy 100. Notwithstanding Relator's assessment and recommendation, as long as the patient had a diagnosis of respiratory failure or a pCO2 measurement greater than 55, HomeMed would call Dr. Sharma and request the patient be switched to a Trilogy 100. Dr. Sharma always agreed to switch the patient to a Trilogy 100.

56.    Despite agreeing to the switch, it is obvious that the Trilogy 100 is not medically necessary because Dr. Sharma's original prescription reflects the CPAP pressures or BiPAP IPAP and EPAPs he wants used. The lack of medical necessity is also reflected in the fact that Dr. Sharma does not prescribe a tidal volume, which is individually tailored to the patient and necessary to setup a ventilator. It is further reflected in the fact that, on one occasion when Relator was talking to Dr. Sharma about a patient who was prescribed a Trilogy 100, Dr. Sharma told Relator to make sure the patient had an IPAP and an EPAP. It is also reflected in the fact that he informed patients that they needed to use the machine at least four (4) hours per day or its use would be discontinued. This minimum use requirement is imposed by Medicare for BiPAP machines. Medicare does not impose a minimum use requirement for ventilators. Ironically, Dr. Sharma also started having patients sign a statement acknowledging that they might die if they did not use the Trilogy 100.

57.    Once a patient was switched to a Trilogy 100, HomeMed would bill Medicare, Medicaid, or other appropriate insurer. During Relator's employment, HomeMed employed five

14

billers: Melinda Whitaker, Teresa Murphy, Nikki White, Melinda Weldon, and "Mary" (last name unknown). Each biller is assigned a section of the alphabet and is responsible for submitting bills pertaining to patients whose last name begins with a letter in their section. Susan Weddle is the claims coordinator and oversees HomeMed's billers.

58.     In addition to proactively having patients switched to the Trilogy 100, HomeMed also sends Rusty Alliston and its marketing person to doctor's offices and skilled nursing facilities to demonstrate and promote the Trilogy 100.

59.     On the first Monday of every month at 8 a.m., HomeMed's directors, Chris Pappas and Rodney Meadows, hold a meeting to discuss every revenue-generating item or source, including the number of CPAP, BiPAP, and Trilogy 100s currently prescribed, the goal number they want prescribed, the projections for the following month and the revenue that HomeMed is generating. Everyone who works at HomeMed attends this monthly meeting. To ensure that everyone knows the target goals, there is a chalkboard in HomeMed's office that lists the number of CPAP, BiPAP, and Trilogy 100s it wants prescribed for that month.

60.     Since initially wanting 6 Trilogy 100s prescribed to cover Relator's salary, HomeMed has continually increased the number of Trilogy 100s it wants prescribed. To justify the increased numbers, Chris Pappas told Relator on several occasions that HomeMed needed to "grow the business."

61.     The Trilogy 100 collects detailed clinical data that, when reviewed, allows a physician to monitor the patient's compliance and make adjustments to the patient's ventilation therapy. Once a patient was switched to a Trilogy 100, Relator would go to the patient's home to deliver, setup, and instruct the patient on its use. During the first month of use, Relator would go to the patient's home every week to adjust settings and monitor the patient. Thereafter, Relator

15

would go to the patient's home once per month to check the device and download the information contained on the SD card.

62.     Once downloaded, Relator went back to HomeMed's office and generated a report containing the following data:   patient information, waveforms, trends, daily detail, patterns of usage, compliance summary, statistics, summary, and settings and alarms.   This lengthy report was then faxed or emailed to Dr. Sharma.  A copy was also saved by HomeMed using its MedForce software.  Because of its length, Dr. Sharma told Relator he only wanted the data showing the patient's daily usage of the Trilogy 100, which was presented in the form of a bar graph.

63.     Several patients who were inappropriately switched told Relator that they did not like using the Trilogy 100 because of discomfort.  Relator would relay these complaints to Chris Pappas or Rodney Meadows who would then instruct Relator to simply adjust the Trilogy 100 until the patient could tolerate the tidal volume, thereby eliminating the complaints.

64.     Of the patients who complained about the Trilogy 100, at least two refused to use the Trilogy 100.  One patient told HomeMed to pick up the Trilogy 100, but HomeMed ignored this request for six (6) months, all the while billing Medicare for the Trilogy 100.  For the other patient, Relator adjusted the tidal volume multiple times, as instructed by Chris Pappas and Rodney Meadows, but the patient still refused to use the Trilogy 100.  Even had the Trilogy 100 been medically necessary, Relator had to adjust it so low that the patient would not have received any therapeutic benefit.  In any event, if a patient is not using a device, it is not reimbursable.

65.     Relator repeatedly objected to HomeMed switching patients to the Trilogy 100 so it could bill for a ventilator.  On one occasion, Relator raised his concerns and objections to

16

Rodney Meadows and Mr. Meadows told Relator that it "isn't your license" and that he would not get in any trouble if HomeMed was caught.

66.    Relator also complained about HomeMed's fraudulent practices to Chris Pappas. Mr. Pappas would tell Relator to set the patient up because HomeMed had the order. Mr. Pappas also told Relator that HomeMed could find a "loophole" or some justification, like the PCO2 measurement or respiratory failure diagnosis, for billing for the Trilogy 100 when it was not medically necessary.

67.    Relator also frequently complained to Rusty Alliston, HomeMed's other respiratory therapist. Mr. Alliston agreed that HomeMed was inappropriately switching and fraudulently billing for the Trilogy 100. However, Mr. Alliston indifferently told Relator that doing so ensured job security and that the patients were not being harmed.

68.    When Relator complained to Tonya Williams about HomeMed's fraudulent practices, Ms. Williams told Relator to do as he was told and that it was not his problem once HomeMed received the order for the Trilogy 100.

69.    During the time Relator was employed at HomeMed, 30 to 36 patients were setup with the Trilogy 100. Approximately 24 to 26 of these patients were prescribed the Trilogy 100 by Dr. Sharma. The remaining 10 to 12 patients were switched to the Trilogy 100, at HomeMed's request, when it was not medically necessary so it could bill the higher monthly rental rate. One example of HomeMed's fraudulent behavior is patient A, who had a diagnosis of respiratory failure, but whose PCO2 measurement was always within the normal range. Patient A did not have any difficulty breathing normally and, in fact, Relator saw patient A walk about 60-70 yards across her lawn, to her daughter's house without any respiratory distress or difficulty. Thus, it was obvious that patient A did not have a condition that was life threatening,

17

such that interruption of respiratory support would quickly lead to serious harm or death, a medical prerequisite for prescribing the Trilogy 100. Notwithstanding the clear lack of medical necessity, HomeMed had Dr. Sharma switch patient A to a Trilogy 100 and billed Medicare for it.

70.     When Relator left HomeMed in May of 2015, the vast majority of the patients he set up still had the Trilogy 100 and HomeMed was billing Medicare and Medicaid for the machines. HomeMed was also continuing to switch even more patients to the Trilogy 100 when it was not medically necessary, as well as bill for those patients it had already switched. To the best of Relator's knowledge, HomeMed's fraudulent practices continue to this day.

71.     In addition to the fraudulent practices with respect to the Trilogy 100, HomeMed also encourages waste and overutilization with respect to CPAP supplies. Every month, Dot Williams identifies HomeMed CPAP patients who are eligible to receive CPAP supplies based on Medicare's replacement schedule. Ms. Williams calls and informs each patient that they are eligible for more supplies and need to get them. In December, Ms. Williams also tells the patients that they need to get supplies before the year ends and their deductible for the new year rolls over. Inevitably, HomeMed experiences a year end rush for CPAP supplies.

72.     HomeMed's actions with respect to CPAP supplies are contrary to Medicare policy which prohibits DME suppliers from dispensing a "quantity of supplies exceeding a beneficiary's expected utilization" and requires suppliers to "stay attuned to changed or atypical utilization patterns on the part of their clients." *See* CGS Administrators, LLC, Local Coverage Determination: *Positive Airway Pressure (PAP) Devices for the Treatment of Obstructive Sleep Apnea* (L33718).

## COUNT ONE
## FEDERAL FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(1)(A)

73.     Relator repeats and realleges each and every allegation contained in paragraphs 1 through 72 of this Complaint as if set forth herein at length.

74.     This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(C).

75.     As a result of the misconduct alleged herein, Defendants knowingly presented or caused to be presented, to the United States false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

76.     The United States, unaware of the false or fraudulent nature of these claims, paid such claims when it would not otherwise have done so if it had known the truth.

77.     By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

## COUNT TWO
## FEDERAL FALSE CLAIMS ACT
## 31 U.S.C. § 3729(a)(1)(C)

78.     Relator repeats and realleges each and every allegation contained in paragraphs 1 through 72 of this Complaint as if set forth herein at length.

79.     Through the misconduct alleged herein, Defendants knowingly conspired to present, or cause to be presented, false or fraudulent claims for payment or approval to the United States, and knowingly conspired to make, use, or caused to be made or used, false records or statements material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(C).

80.     The United States, unaware of the false or fraudulent nature of these claims, paid such claims when it would not otherwise have done so if it had known the truth.

81.     By reason of these payments, the United States has been damaged, and continues to be damaged, in a substantial amount to be proven at trial.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Relator prays that judgment be entered against the Defendants, ordering that:

A.      Defendants cease and desist from violating the federal False Claims Act, 31 U.S.C. § 3729, *et seq.*;

B.      Defendants pay the United States not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729, plus three times the amount of damages the United States has sustained because of Defendants' misconduct;

C.      Relator be awarded the maximum relator's share allowable pursuant to 31 U.S.C. § 3730(d);

D.      Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to 31 U.S.C. § 3730(d) and any other applicable law or regulation;

E.      Defendants be enjoined from concealing, removing, encumbering, or disposing of assets which may be required to pay the damages, penalties, fines, attorneys' fees and costs awarded by the Court; and

F.      The United States and Relator be awarded such other, further or different relief as the Court deems just and proper.

## VII.     JURY TRIAL DEMAND

Relators hereby demand trial by jury.

DATED:  March 24, 2016 Respectfully submitted,

**MILBERG LLP**

Roland W. Riggs
Joseph Birton Reynolds
rriggs@milberg.com
breynolds@milberg.com
One Pennsylvania Plaza, 50th Floor
New York, NY  10119-0165
Telephone: (212) 594-5300
Fax: (212) 868-1229

**JONES & HAWLEY P.C.**
G. Douglas Jones
2001 Park Place North
Suite 830
Birmingham, Alabama 35203
Telephone:  (205) 490-2290
Fax:  (205) 490-2295